**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| CHAD ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case number 4:09cv1281 HEA |
| | ) | TCM |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This is an action under 42 U.S.C. § 405(g) for judicial review of the final decision of

Michael J. Astrue, the Commissioner of Social Security (Commissioner), denying Chad Allen

(Plaintiff) supplemental security income (SSI) under Title XVI of the Social Security Act (the

Act), 42 U.S.C. § 1381-1383b. Plaintiff has filed a brief in support of his complaint; the

Commissioner has filed a brief in support of his answer. The case was referred to the

undersigned United States Magistrate Judge for a review and recommended disposition

pursuant to 28 U.S.C. § 636(b).

**Procedural History**

Plaintiff applied for SSI in December 2006, alleging that he was disabled as of October

19, 2005, by gunshot injuries to his right leg and a bullet in his right shoulder. (R.[1] at 82-84.)

His application was denied initially and after a hearing held in October 2008 before

---

[1]References to "R." are to the administrative record filed by the Commissioner with his answer.

Administrative Law Judge (ALJ) Michael D. Mance. (Id. at 15-54, 1-22, 40-46, 232-65.) The Appeals Council denied Plaintiff's request for review, effectively adopting the ALJ's decision as the final decision of the Commissioner. (Id. at 1-3.)

## Testimony Before the ALJ

Plaintiff, represented by counsel, and Vincent Stock, a vocational expert ("VE"), testified at the administrative hearing.

Plaintiff testified that he was then 32 years old[2] and had dropped out of school after the ninth grade because he was "slow in learning." (Id. at 31-32.) After leaving high school, Plaintiff worked for various employers as a dishwasher or janitor. (Id. at 32.) He lived with his mother and father. (Id.)

Plaintiff was shot in the leg on October 19, 2005, as he was getting into his car. (Id. at 32.) He had been shot in the shoulder in 2001 when someone tried to rob him. (Id. at 33.)

Plaintiff has been in prison twice: once from 2004 though 2006 for possession of cocaine and the second time after he violated his parole by not working. (Id. at 33.) Asked about his use of heroin, Plaintiff replied that he had tried it once. (Id.) He had stopped drinking. (Id. at 33-34.) He was not using drugs.[3] (Id. at 34.)

---

[2]Plaintiff was born on May 1, 1976. (Id. at 49.)

[3]As noted by the ALJ, Plaintiff's parole officer reported that his five drug screens were negative. (Id. at 160.)

Asked about what prevented him from working, Plaintiff replied that his leg was the primary reason and also he was unable to read. (Id. at 34.) Specifically, his leg throbs and gives out on him. (Id.) He has constant pain. (Id.)

Plaintiff described his daily activities as taking medication and sleeping. (Id. at 34-35.) He tries to make the bed. (Id. at 38.) He vacuums the floor three or four times a year. (Id. at 39.) His mother takes care of him, including doing the shopping, paying the bills, and cleaning the house. (Id. at 39-40.) He goes out with his sister when she can take him somewhere. (Id. at 38.) He can walk for fifteen or twenty minutes. (Id. at 35.) He can stand for ten minutes at most. (Id.) If he sits for long, his leg starts hurting. (Id. at 35-36.) Also, his right shoulder hurts if he uses it a lot. (Id. at 36.) He can lift his right arm above his shoulder a little. (Id.) Medication helps relieve the pain "[a] little bit." (Id.) It also makes him sleepy. (Id. at 38.) He will fall asleep for short periods of time a couple of times a day. (Id. at 39.)

His doctor is talking about sending him back to surgery. (Id. at 37.) He last saw the doctor in August of that year. (Id.) Plaintiff does not receive any treatment for mental problems. (Id.)

The VE, having reviewed the records, classified Plaintiff's past work as a dishwasher, table busser, and factory worker as medium with a specific vocational preparation (SVP) time of 2[4]; as a janitor, vendor, and warehouseman as medium with a SVP of 3; and as a laborer

---

[4]A SVP of 1-2 corresponds to unskilled work; a SVP of 3-4 corresponds to semi-skilled work. Policy Interpretation Ruling:  Titles II and XVI:  Use of Vocational Expert and Vocational Specialist Evidence, SSR 00-4p, 2000 WL 1898704, *3 (S.S.A. 2000).

as heavy with a SVP of 1. (Id. at 42-43.) The ALJ then asked the VE the following hypothetical question:

> [A]ssume an individual of [Plaintiff's] age, education level, same past work experience. . . . [A]ssume the individual was limited to performing what is classified or defined as medium exertional level work with the following limitations; the individual . . . is limited to climbing stairs and ramps no more than occasionally, never climbing ropes, ladders and scaffolds, . . . is limited to frequently kneeling, crouching and crawling. Reaching overhead is limited to frequently on the right. The individual should avoid concentrated exposure to unprotected heights, hazardous machinery – and vibration. And such individual is limited to performing simple tasks only. Would . . . such an individual be able to perform any of the claimant's past work?

(Id. at 43-44.) The VE replied that such individual could work as a dishwasher, busser, janitor, factory worker, vendor, and warehouseman. (Id. at 44.) The only position that was not available was the heavy laborer position. (Id.)

The ALJ asked the VE a second hypothetical question:

> The individual is limited to light exertional level work as defined as light. Occasionally climbing stairs and ramps, never climbing ropes, ladders and scaffolds, occasionally kneeling, crouching and crawling. Reaching overhead is limited to no more than occasional on the right. And again, the individual should avoid concentrated exposure to unprotected heights, hazardous machinery, vibration and is limited to simple tasks. Could such an individual perform any of [Plaintiff's] past work?

(Id. at 44.) The VE answered that such individual could not perform such work as it was performed in the national economy but could as it was performed by Plaintiff. (Id.) If such individual was limited to the sedentary exertional level with all of the same non-exertional limitations of the individual in the second hypothetical, Plaintiff's past work would be unavailable. (Id. at 45.) Such individual could, however, work as an assembly line fabricator

and a loader of semi-conductor dyes.  (Id.)  Both positions were unskilled and sedentary; both existed in significant numbers in the state and national economies.  (Id.)

If there were also occasional disruptions in such individual's workday and workweek due to pain and the effects of medication, there were no jobs that individual could perform. (Id.)  If, as indicated in Dr. Schlitt's[5] report, the individual had a GAF of 40[6] and other extreme issues, such individual would not be able to maintain a job on the open labor market. (Id. at 46.)

## Medical and Other Records Before the ALJ

The documentary record before the ALJ included forms Plaintiff completed as part of the application process, documents generated pursuant to his application, records from various health care providers, and the reports of two consultative examinations.

When applying for SSI, Plaintiff completed a Disability Report.  (Id. at 100-07.)  He listed his height as 6 feet 1 inch and his weight as 200 pounds.  (Id. at 100.)  He could speak, understand, and read English.  (Id.)  He could write more than his name in English.  (Id.)  He could not stand for long, walk far, or run.  (Id. at 101.)  He had to use a cane most of the time.

---

[5]The doctor's name is spelled "Slit" in the transcript.  The Court will employ the correct spelling of "Schlitt."

[6]"GAF" refers to the Global Assessment of Functioning Scale.  "According to the *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Revision 2000), the Global Assessment of Functioning Scale is used to report 'the clinician's judgment of the individual's overall level of functioning.'"  **Hudson v. Barnhart**, 345 F.3d 661, 663 n.2 (8th Cir. 2003); accord **Juszczyk v. Astrue**, 542 F.3d 626, 628 n.2 (8th Cir. 2008).  A GAF between 31 and 40 is indicative of "[s]ome impairment in reality testing or communication . . . OR major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood . . . ."  Diagnostic Manual at 34.

(<u>Id.</u>)  His injuries first bothered him on October 19, 2005, and prevented him from working that same day.  (<u>Id.</u>)  He stopped working on September 30, 2005, because his work was seasonal.  (<u>Id.</u>)  He had worked as a janitor, busser, laborer, and vendor and had worked with a temporary agency.  (<u>Id.</u> at 102.)  The job he had held the longest was as a janitor.  (<u>Id.</u>)  A separate Work History Report listed the same jobs.  (<u>Id.</u> at 110-17.)

Plaintiff also completed a Function Report.  (<u>Id.</u> at 118-25.)  Asked to describe his day from when he woke up to when he went to bed, Plaintiff explained that he did not do anything because of his leg pain.  (<u>Id.</u> at 118.)  He took two tables of Ibuprofen every four hours.  (<u>Id.</u>)  His leg hurt when he tried to walk and when he stood too long.  (<u>Id.</u>)  He eats, watches television, treats his leg, and prays for better days.  (<u>Id.</u> at 119.)  He takes care of his son.  (<u>Id.</u>)  The sharp pain affects his sleep, makes it take longer to dress, and prevents him from shaving.  (<u>Id.</u>)  He has to put oil on his skin to keep from losing the skin graft and uses peroxide to keep the graft clean.  (<u>Id.</u> at 120.)  His mother sometimes had to remind him to take medication.  (<u>Id.</u>)  He can fix a simple sandwich.  (<u>Id.</u>)  He goes outside three times a week.  (<u>Id.</u> at 121.)  He could pay bills, handle a savings account, and count change.  (<u>Id.</u>)  His interests included sports, working, and teaching his son.  (<u>Id.</u> at 122.)  He used to be very good at these, but now his leg prevents him from doing them.  (<u>Id.</u>)  His impairments affected his ability to lift, bend, stand, walk, kneel, climb stairs, and follow instructions.  (<u>Id.</u> at 123.)  They did not affect his ability to squat, reach, sit, talk, hear, see, remember, complete tasks, concentrate, understand, use his hands, and get along with others.  (<u>Id.</u>)  The farthest he could walk was three to four blocks.  (<u>Id.</u>)  He has problems understanding big words, is not smart,

and was in learning disabled classrooms.  (Id.)  He uses a cane or crutches, prescribed by a doctor in November 2005.  (Id. at 124.)

After the initial denial of his application, Plaintiff completed a Disability Report – Appeal form.  (Id. at 134-40.)  As of January 2, 2007, his leg was worse.  (Id. at 135.)

Plaintiff had reported earnings between 1975 and 2001, inclusive.  (Id. at 85.)  His annual earnings were never greater than $8,000.  (Id.)  In the years from 1992 to 2007, inclusive, he had no annual earnings in four years (1995, 2002, 2003, and 2006), less than $500 in two years, and less than $5,000 in five.  (Id.)  He had his eighth highest, $1,141.39, in 2007.  (Id.)  In July 2008, he was hired by the Indiana State Fair Commission.  (Id. at 87.)  There is no indication in the record that he had any wages from the Commission.

An interviewer when Plaintiff applied for SSI noted that he walked with a slight limp.  (Id. at 99.)

The medical records before the ALJ are summarized below in chronological order.

On March 12, 2005, Plaintiff went to the emergency room at St. Louis University Hospital (SLUH) with an anxiety attack; his heart was racing and he was having difficulty breathing and swallowing.  (Id. at 261-74.)  The day before, he had used heroin and had drunk 48 ounces of beer.  (Id. at 264, 266, 267.)  X-rays and an electrocardiogram were normal, with the exception of the chest x-ray revealing the bullet in the his right shoulder.  (Id. at 265, 268, 274.)  He was discharged with instructions to stop using street drugs and alcohol, sleep with his head elevated, and return if his symptoms worsened or persisted longer than two to three days.  (Id. at 269.)

A medical history for Plaintiff taken in December 2005 when he was incarcerated with the Missouri Department of Corrections (DOC)[7] notes that he had lost muscles in his right leg due to a gun shot wound in October 2005.[8]  (Id. at 162.)  He had an infected incision in his right thigh.  (Id. at 163.)  There was drainage from the scar, and there had been for approximately three months.  (Id. at 178-80.)  The area was painful.  (Id. at 180.)  Dressing was applied to the area.  (Id. at 181, 183.)  There was no drainage the next day and no pain. (Id. at 183.)  The following day, December 18, Plaintiff had an open area above his right knee causing pain that was a seven on a ten-point scale.  (Id. at 194.)  Drainage began again the next day.  (Id. at 195.)  On December 20, the examining doctor concluded that Plaintiff had an infection at the incision site.  (Id. at 195, 200, 202, 203.)  Plaintiff reported that he was doing okay.  (Id. at 201.)  On December 28, after a regular series of the dressing on his thigh being changed, it was noted that an ulceration in the center of the incision was almost closed. (Id. at 208, 209, 210, 211, 212.)  As of January 3, 2006, there was no drainage.  (Id. at 213.) On January 16, while Plaintiff was taking to a nurse, a small area where the skin graft was done opened up.  (Id. at 216.)  Several days later, the area tested positive for a staph infection; Plaintiff was given an antibiotic to be taken twice a day for ten days.  (Id. at 218.)  On February 3, Plaintiff reported that he was doing fine now that the area on his right leg had healed.  (Id. at 220.)  There was no drainage.  (Id.)  There was no sign of an infection.  (Id.)

---

[7]The DOC records mistakenly list Plaintiff's year of birth as 1974.

[8]A DOC screening sheet for medical/mental health does not list any mental health history or concerns for Plaintiff, although it does note a history of psychotropic medication.  (Id. at 94.)  The year of the screening is illegible.

One month later, Plaintiff reported that he was having sharp pains from the staples in his right leg.  (Id. at 222.)  He walked "well."  (Id.)  He did not appear for a follow-up appointment, but did return in April with complaints of clear drainage from the graft site and sharp pain.  (Id. at 225-26.)  It appeared that one or more of the numerous staples in his leg was working its way out.  (Id.)  In May, there was drainage from the graft site and pain.  (Id. at 228-29.)  A dressing was applied and was to be changed twice a day until the area had healed.  (Id. at 229.)  The following month, Plaintiff complained of a staple coming out and of increasing pain.  (Id. at 230.)  He requested a medical lay-in excusing him from work.  (Id. at 232.)  He was given one until he could see the doctor.  (Id. at 232.)  The nurse noted that Plaintiff had not been taking the prescribed medication.  (Id.)  A lay-in was later given until July 1.  (Id. at 231.)

Plaintiff saw the DOC doctor again in November.  (Id. at 235.)  Contrary to his impression, a staple was not coming out, but there was a small amount of drainage.  (Id.)  He was given a limited work restriction.  (Id.)  A culture was taken and revealed a staph infection.  (Id. at 235-36.)  Another doctor was to be consulted about a treatment plan, the first doctor noting that it was not possible to remove all the staples in Plaintiff's leg.  (Id. at 236-37.)  One week later, there was no drainage and the wound had healed.  (Id. at 238-39.)

On January 3, 2007, Plaintiff went to the SLUH emergency room for treatment of his bleeding and painful right leg.  (Id. at 250-64, 275-92.[9])  He was treated and released in

---

[9]Pages 275 to 292 are duplicates of pages 250 to 264 and copies of releases signed by Plaintiff.

approximately five hours with instructions to follow-up with a Dr. Kraemer and to take Tylenol as needed.  (Id. at 252, 257, 259-60.)

Five months later, on May 29, Plaintiff consulted the health care providers at Grace Hill Neighborhood Health Center about his right leg and shoulder pain.  (Id. at 313-14.)  He was given Ibuprofen for the pain and was to return if the pain continued.  (Id. at 314.)  He did return the following month and reported that the Ibuprofen was not working.  (Id. at 310-12, 448-49.)  It was noted that he had been told when at an emergency room to see a plastic surgeon.  (Id. at 311, 449.)  Plaintiff was referred to St. Louis ConnectCare.  (Id. at 312.)

Subsequently, Plaintiff was seen in the St. Louis ConnectCare general surgery clinic on July 24.  (Id. at 400, 435-39, 442.)  He reported pain at the site of the right leg skin graft, was prescribed Neurontin, and was to have an ultrasonogram.  (Id. at 410, 438, 439.)  The ultrasonogram of Plaintiff's right leg taken on August 20 to check for an abscess was unremarkable.  (Id. at 434.)

The following month, Plaintiff complained of right leg pain that was an eight and was worse at night.  (Id. at 399, 430-31, 441.)  He had been released on parole, was working, and could afford medication.  (Id. at 430.)  He was prescribed Neurontin.  (Id. at 409, 430, 460.) He was given a Certificate of Attendance from the clinic requesting that he be allowed to rest his leg for fifteen minutes every other hour or as needed.  (Id. at 459.)

When Plaintiff returned to the clinic on December 6, the wound was healed, but the chronic pain continued.  (Id. at 397, 427-28.)  The Neurontin had helped; however, he had run

out of his prescription a month earlier.  (<u>Id.</u> at 427.)  He was in no apparent distress, and was to be referred to the neurology clinic.

Plaintiff was first seen at the St. Louis ConnectCare neurology clinic on January 4, 2008, for the neuropathic pain in his right leg.  (<u>Id.</u> at 398, 420-26.)  It was noted that he had received treatment of alcohol or drugs in January 2006 and had had work-related injuries in November 2007.  (<u>Id.</u> at 420.)  He was currently having problems bending or lifting and with his joints.  (<u>Id.</u>)  He was sexually active.  (<u>Id.</u> at 421.)  He was prescribed Amitriptyline (an anti-depressant), Seroquel, Neurontin (a pain reliever), and Ibuprofen.  (<u>Id.</u> at 407-08.)

When at the neurology clinic on April 7, Plaintiff reported some improvement in his right leg pain, described as sharp, on the Amitriptyline.  (<u>Id.</u> at 396, 417-19.)  The prescription was renewed.  (<u>Id.</u> at 406.)

When seen at the neurology clinic on June 30, Plaintiff complained of right leg pain that was an eight.  (<u>Id.</u> at 395, 414-16, 440.)  He explained that the previously-prescribed gabapentin (Neurontin) was ineffective.  (<u>Id.</u> at 414-15.)  He had also been prescribed Amitriptyline, but it was unclear if he had ever taken it.  (<u>Id.</u> at 414.)  He felt his right leg would give out after walking long distances.  (<u>Id.</u>)  Because the pain was thought to be primarily localized, he was to try a Lidoderm patch.  (<u>Id.</u> at 415.)  In addition to the Lidoderm patch, he was prescribed Tylenol, Neurontin, and Ibuprofen.  (<u>Id.</u> at 395, 404-05.)

When Plaintiff returned to the neurology clinic on September 29, he reported that the Lidoderm patch was too expensive so he had not been using it.  (<u>Id.</u> at 394, 411-13.)  He hd been taking ibuprofen and Tylenol and some oxycodone that he had obtained from a friend.

(Id. at 411.)  This helped for a short period of time, but the pain would recur if he stood up or did any physical activity.  (Id.)  He had been on Amitriptyline and Neurontin, but one of them made him too drowsy, he did not know which, and neither were effective.  (Id.)  He was prescribed Carbamazepine, Capsaium topical cream, and a Lidoderm patch.  (Id. at 401-03.)  He would try the latter if the cost was less at the in-house pharmacy.  (Id. at 412.)  He was to start using the Capsaium topical cream and then switch to the Carbamazepine if the cream was ineffective.  (Id.)  His next appointment was on December 29.  (Id. at 413.)  Also, he was given a Certificate of Attendance from the clinic limiting him to sitting tasks only and noted that he could not stand or walk for more than few minutes at a time.  (Id. at 381, 451.)

Reports of two consultative examinations were by Drs. Buckley and Schlitt.

Pursuant to his SSI application, Plaintiff was evaluated by Brenda Buckley, M.D., in March 2007.  (Id. at 295-302.)  Plaintiff informed her that the bullet to her right lower leg had hit a major artery and that he had undergone four surgeries on the leg.  (Id. at 296.)  He had a small wound caused by a staple under the skin and causing drainage.  (Id.)  The pain in his leg was sharp, constant, an eight to nine on a ten-point scale, and worse at night and with movement.  (Id.)  He had difficulty standing and walking and used a cane.  (Id.)  He also had constant pain in his right shoulder caused by a bullet left in the shoulder and causing difficulty lifting things.  (Id.)  Plaintiff reported that he could stand for three to four hours at a time, sit for thirty minutes, walk for three blocks, lift fifty pounds at a time, and drive.  (Id.)  He did not do household chores and spent most of his time lying down.  (Id.)  His current medications included Ibuprofen and Tylenol.  (Id. at 297.)  He was 6 feet 1 inch tall and

weighed 190 pounds.  (<u>Id.</u>)  On examination, he was well-developed, well-nourished, and able to get up and out of the chair and exam table without difficulty.  (<u>Id.</u>)  He walked with slight difficulty and had a mild limp.  (<u>Id.</u> at 297, 298.)  He had walked from the bus stop to her office.  (<u>Id.</u> at 299.)  He did not use an assistive device, although he had brought a cane to the office.  (<u>Id.</u> at 298, 299.)  The strength in his upper and lower extremities was 5/5.  (<u>Id.</u> at 298.)  He was unable to walk on his toes or heels, but was able to heel-to-toe walk.  (<u>Id.</u>)  There was no muscle atrophy or tenderness.  (<u>Id.</u>)  He had no sensation to touch or pinprick over the anterior surface of his right lower leg.  (<u>Id.</u>)  The range of motion in his right shoulder was limited by one-fifth and in his right knee by one-third.  (<u>Id.</u> at 300.)

Dr. Buckley's diagnosis was right leg and shoulder pain from gunshot wounds.  (<u>Id.</u> at 299.)  She concluded that Plaintiff was not limited in his ability to sit, stand, walk, lift, carry, hear, speak, travel, or handle objects.  (<u>Id.</u>)

At his attorney's request, Plaintiff was also evaluated for three hours by Robert E. Schlitt, Ph.D., a licensed psychologist, in October 2008.  (<u>Id.</u> at 382-93.)  Dr. Schlitt's report states that Plaintiff's psychiatric condition, notably post-traumatic stress disorder (PTSD) and depression, have significantly affected his ability to work since the gunshot wound to his leg.  (<u>Id.</u> at 383.)  Plaintiff has frequent flashbacks about the shooting, has nightmares, is distrustful, and can be  paranoid.  (<u>Id.</u>)  He felt sad, down, discouraged about the future, inadequate, inferior, angry, indecisive, frustrated, and overwhelmed.  (<u>Id.</u>)  He had insomnia, worried about his health, and had a loss of libido and appetite.  (<u>Id.</u>)  Plaintiff was in the "severe depression" range on the David Burns Depression Checklist.  (<u>Id.</u>)  Dr. Schlitt opined

that Plaintiff's school records indicated an undiagnosed learning disability of Attention Deficit/Hyperactive Disorder (ADHD). (Id.) On examination, Plaintiff was alert, oriented, depressed, and anxious. (Id.) Results of a David Burns Anxiety Inventory indicated that he felt things around him seemed strange and unreal. (Id.) He was tense, stressed, uptight, on edge, restless, jumpy, tired, constipated, and weak. (Id.) He had problems concentrating, was fearful he would faint, had racing thoughts, and had tingling and numbness in his "fingers or toes." (Id.) His responses placed him in the "extreme anxiety" range on the inventory. (Id.) Tests of his attitudes and beliefs also indicated sadness, paranoia, passive aggressive/aggressive traits, and dependency. (Id. at 387.)

His scores on the Wechsler Adult Intelligence Scale-Fourth Edition (WAIS-IV) included a verbal comprehension index of 66, placing him in the mild mental retardation range; a perceptual reasoning index of 73, placing him in the low average range; and a working memory index of 89, a processing speed index of 76, and a full scale intelligence quotient (IQ) of 70, each placing him in the borderline range of intellectual abilities. (Id. at 385-86.) Questions frequently had to be repeated. (Id. at 386.) Indicative of someone with ADHD, he would miss easy items on a test and then correctly answer more difficult ones. (Id.) Overall, he was functioning in the low end of the borderline intellectual functioning range. (Id.)

Plaintiff's current medication included Lidoderm Patch, Capsaium topical cream, and Carbamazepine, but no psychotropic medication. (Id. at 384, 393.) Dr. Schlitt thought such medication was needed by Plaintiff, as was treatment by a psychiatrist. (Id. at 384, 389.) His

diagnosis was affective disorder, depression; anxiety disorder, not otherwise specified; PTSD; and by history, learning disorder, not otherwise specified.  (Id. at 389.)  His current GAF was 40.[10]  (Id. at 390.)

Asked to rate Plaintiff's abilities to function in four activities of daily living, Dr. Schlitt rated him as extreme in one, functioning independently, and marked in three, coping with stress, behaving in an emotionally stable manner, and maintaining reliability.  (Id. at 391.) He rated Plaintiff's abilities to function socially as extreme in one, working in coordination with others; marked in two, relating in social situations and maintaining socially acceptable behavior; and moderate in two.  (Id.)  In his ability to concentrate, persist, or pace himself, Plaintiff was rated as extreme in four activities and marked in one.  (Id.)  Dr. Schlitt also opined that Plaintiff's psychologically-based symptoms would cause him to miss work three or more times a month and would cause him to be late with the same frequency.  (Id. at 392.) His limitations were expected to last twelve continuous months or had already done so.  (Id.) These limitations would have existed, at the earliest, three years ago when Plaintiff was shot in the leg.  (Id.)

Additionally, a non-examining consultant, with the Missouri Section of Disability Determinations, completed a Physical Residual Functional Capacity Assessment ("PRFCA") of Plaintiff in March 2007.  (Id. at 303-08.)  The primary diagnosis was gunshot wound to the right leg; the secondary diagnosis was gunshot wound to the right shoulder.  (Id. at 303.) These impairments resulted in exertional limitations of Plaintiff being able to occasionally or

---

[10]See note 10, supra.

carry lift fifty pounds; frequently lift or carry twenty-five pounds; and stand, walk, or sit about six hours in an eight-hour day.  (Id. at 304.)  His ability to push or pull was unlimited other than these lifting and carrying restrictions.  (Id.)  He had postural limitations of frequently avoiding balancing, stooping, and climbing ladders, ropes, or scaffolds, and of occasionally avoiding kneeling, crouching, and crawling.  (Id. at 305-06.)  He had no manipulative, visual, communicative, or environmental limitations.  (Id. at 306-07.)

Also before the ALJ were Plaintiff's school records.

The Special School District and the Office of Special Education for the St. Louis Public Schools did not have any records for Plaintiff.  (Id. at 109.)  Records from the St. Louis City Public School District and Maplewood School District were submitted.  (Id. at 144-52, 157-59, 316-80.)  His elementary school record indicates that Plaintiff repeated the second grade twice.  (Id. at 146, 157, 318.)  When repeating the first time, Plaintiff was referred in April 1985 for evaluation and development of an individualized education plan (IEP).  (Id. at 316-19, 330-325, 330-41.)  On the Wechsler Intelligence Scale for Children-Revised (WISC-R), he had a verbal IQ of 78, a performance IQ of 86, and a full scale IQ of 80.[11]  (Id. at 319.)  He was thought to be weak in reading skills and average in arithmetic, although he

---

[11]The Eighth Circuit Court of Appeals described the three IQ measurements as follows.  "The Full Scale IQ provides a measure of general intelligence. The Verbal IQ provides a measure of verbal comprehension, including the application of verbal skills and information to the solution of new problems, ability to process verbal information, and the ability to think with words. The Performance IQ provides a measure of perceptual organization, including the ability to think in visual images and to manipulate these images with fluency and relative speed, to reason without the use of words and to interpret visual material quickly."  **Scott ex rel. Scott v. Astrue**, 529 F.3d 818, 820 n. 1 (8th Cir. 2008).

had problems in adding or borrowing. (Id. at 338.) His estimated mental age of seven years was one year and nine months behind his chronological age expectancy. (Id.) His current intellectual ability was in the borderline range. (Id.) His practical knowledge and social awareness were adequate for his age. (Id.) It was concluded that he was mildly learning disabled in reading. (Id. at 340.) There was also a concern that he was developing uncooperative and negative behaviors that could potentially cause a behavior disorder. (Id. at 341.)

In February 1991, school officials noted that Plaintiff had started skipping school to be with his sixteen-year old brother. (Id. at 326.) It was also noted that he was easily distracted, talked out of turn, was overly aggressive to his peers, was disrespectful to peers and adults, was controlling, gave up easily, did not complete tasks, sought attention, and was inattentive. (Id. at 342.) His tests scores were within the low average range of intelligence. (Id. at 343.) Although his chronological age was fourteen years, eleven months, his mental age was twelve years, five months. (Id. at 342, 343.) In April 1992, it was noted that Plaintiff was in the low average range of intelligence with a performance IQ that was nine points higher than his verbal IQ. (Id. at 363.) He displayed an aggressive nature most of the time. (Id.)

He was listed as "LD" after the fourth grade. (Id. at 146, 157.) With the exception of a C in physical education, Plaintiff's grades in the ninth grade, the 1991/92 academic year, were either Fs or Ds. (Id. at 144.) He withdrew from the St. Louis City Public School District in November 1992, entered the Maplewood School District in December, and dropped

out in January 1993.  (Id. at 145, 150.)  He re-entered Maplewood schools three weeks later

and dropped out again in May 1993.  (Id. at 150.)  His grades at that time were three Fs

(world history, biology, and pre-algebra) and one Incomplete (self-development).  (Id. at 152.)

## The ALJ's Decision

After outlining the Commissioner's five-step sequential evaluation process, see pages

21 to 25, infra, the ALJ found that Plaintiff had not engaged in substantial gainful activity

since he applied for SSI and had severe impairments of traumatic injuries to his right leg and

shoulder from gunshot wounds and a history of substance abuse.  (Id. at 20.)  Explaining the

absence of a finding of a mental impairment, the ALJ found as follows.

> The claimant asserts that I should also consider that he is limited by a multitude
> of mental conditions described by Robert Schlitt, Ph.D., following an October
> 7, 2008 psychological assessment.  The claimant is described as having a
> number of chronic mental health conditions exacerbated by [PTSD] attributed
> to the incidents when he was shot.  He was believed to have a [GAF] of 40,
> which would reflect some impairment in reality testing or communication or
> major impairment in several areas such as work or school, family relations,
> judgment, thinking, or mood.  Dr. Schlitt suggested that he be referred to a
> psychiatrist, to a clinical therapist, to group therapy and for biofeedback to deal
> with his pain.  There is no indication that he sought a referral to a psychiatrist;
> that he has any interest in seeing a clinical therapist; that he showed any interest
> in group therapy; or that he is looking for a referral to biofeedback.  None of
> the health professionals otherwise involved in his care saw fit to make any of
> these referrals.  He has not experienced an episode of deterioration or
> decompensation that required a visit to a clinic, emergency room visit or
> hospitalization.
>
> I appreciate that the claimant may have longstanding behavioral problems as
> reflected in his school records.  However, this evaluation was the first time
> since the October 2005 gunshot wound that he mentioned flashbacks or
> intrusive memories.  He did not report these symptoms while incarcerated and
> he did not report these symptoms when receiving medical attention while on
> supervised release.  The claimant has a history of substance abuse, is a felon

and reports he lied about his name when he was treated at St. Louis University Hospital. These factors make it very difficult to give his unverified reports of the symptoms reported to Dr. Schlitt, without some confirmation or verification. The timing of examination and report indicate that the examination and report were sought to support the allegation that the claimant was disabled. Given the negative factors regarding the claimant's credibility, I assign little weight to the claimant's reports during the consultative examination.

(Id. at 20-21.)

The ALJ next found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled an impairment of listing-level severity. (Id. at 21.) Specifically, Plaintiff was not limited in his use of his hands and arms and, although limited in the functional use of his right leg, walked effectively without assistance. (Id.) Addressing Plaintiff's mental impairments, the ALJ found that he had no restriction in his activities of daily living that was attributable to a medically determinable impairment and had no credible difficulties in social functioning. (Id.) As indicated in his school records, Plaintiff did have moderate difficulties in regard to concentration, persistence, or pace, but these difficulties might be attributed to his substance abuse. (Id.) He had not had a relevant episode of decompensation. (Id.)

When assessing Plaintiff's residual functional capacity (RFC), the ALJ evaluated his credibility. (Id. at 22-25.) He gave little weight to Plaintiff's subjective complaints of pain based on the inconsistencies between his treating doctor's work restrictions, his use of someone else's oxycodone, his bringing a cane to an examination and then not using it, the difficulty in obtaining all his medical records because he sometimes used someone else's

name, the medical advice he take Tylenol for his pain, his lack of a report to medical professionals that his prescribed medication caused excessive sleepiness, his failure to seek emergency room treatment for pain, his failure to regularly elevate his right leg, and the lack of a brace or cane although he complained of weakness in his right leg when walking any significant distance. (Id. at 23-24.) Also detracting from Plaintiff's credibility was his sporadic work record prior to the alleged onset date. (Id. at 24-25.) The ALJ then concluded that Plaintiff could perform regular work activities as long as he was seated; only occasionally needed to climb stairs or ramps; could avoid climbing ropes, ladders, or scaffolds; only occasionally needed to knee, crouch, crouch, and reach overhead with his right arm; could avoid concentrated exposure to vibration, workplace hazards, and unprotected heights; and was limited to simple one-two step work tasks. (Id. at 25.)

Plaintiff had no past relevant work. (Id.) With his age, limited education, ability to communicate in English, and RFC, according to the VE, there were jobs he could perform that existed in significant numbers in the state and national economies. (Id. at 26.) He was not, therefore, disabled within the meaning of the Act. (Id.)

## Additional Record Before the Appeals Council

After the ALJ rendered his adverse decision, Plaintiff submitted a Certificate of Attendance from St. Louis ConnectCare Neurology Ambulatory Care Clinic dated December 22, 2008, limiting him to sitting tasks only. (Id. at 6.)

## Legal Standards

Under the Act, the Commissioner shall find a person disabled if the claimant is "unable to engage in any substantial activity by reason of any medically determinable physical or mental impairment," which must last for a continuous period of at least twelve months or be expected to result in death. 42 U.S.C. § 1382c(a)(3)(A). The impairment suffered must be "of such severity that [the claimant] is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner has established a five-step process for determining whether a person is disabled. See 20 C.F.R. § 404.1520; **Moore v. Astrue**, 572 F.3d 520, 523 (8th Cir. 2009); **Ramirez v. Barnhart**, 292 F.3d 576, 580 (8th Cir. 2002); **Pearsall v. Massanari**, 274 F.3d 1211, 1217 (8th Cir. 2002). "Each step in the disability determination entails a separate analysis and legal standard." **Lacroix v. Barnhart**, 465 F.3d 881, 888 (8th Cir. 2006). First, the claimant cannot be presently engaged in "substantial gainful activity." See 20 C.F.R. § 404.1520(b). Second, the claimant must have a severe impairment. See 20 C.F.R. § 404.1520(c). The Act defines "severe impairment" as "any impairment or combination of impairments which significantly limits [claimant's] physical or mental ability to do basic work activities . . . ." Id. "The sequential evaluation process may be terminated at step two only when the claimant's impairment or combination of impairments would have no more than a minimal impact on [his] ability to work." **Caviness v. Massanari**, 250 F.3d 603, 605 (8th Cir. 2001).

At the third step in the sequential evaluation process, the ALJ must determine whether the claimant has a severe impairment which meets or equals one of the impairments listed in the regulations and whether such impairment meets the twelve-month durational requirement. See 20 C.F.R. § 404.1520(d) and Part 404, Subpart P, Appendix 1. If the claimant meets these requirements, he is presumed to be disabled and is entitled to benefits. **Warren v. Shalala**, 29 F.3d 1287, 1290 (8th Cir. 1994).

"Prior to step four, the ALJ must assess the claimant's [RFC], which is the most a claimant can do despite [his] limitations." **Moore**, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)). "[RFC] is not the ability merely to lift weights occasionally in a doctor's office; it is the ability to perform the requisite physical acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." **Ingram v. Chater**, 107 F.3d 598, 604 (8th Cir. 1997) (internal quotations omitted). Moreover, "'a claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations.'" **Moore**, 572 F.3d at 523 (quoting Lacroix, 465 F.3d at 887). "The need for medical evidence, however, does not require the [Commissioner] to produce additional evidence not already within the record. '[A]n ALJ is permitted to issue a decision without obtaining additional medical evidence so long as other evidence in the record provides a sufficient basis for the ALJ's decision.'" **Howard v. Massanari**, 255 F.3d 577, 581 (8th Cir.

2001) (quoting <u>Frankl v. Shalala</u>, 47 F.3d 935, 937-38 (8th Cir. 1995)) (alterations in original).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. **Wagner v. Astrue**, 499 F.3d 842, 851 (8th Cir. 2007); **Pearsall**, 274 F.3d at 1217. This evaluation requires that the ALJ consider "(1) a claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions." **Wagner**, 499 F.3d at 851 (citing <u>Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir. 1984)). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" **Id.** (quoting <u>Pearsall</u>, 274 F.3d at 1218). After considering the <u>Polaski</u> factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. **Singh v. Apfel**, 222 F.3d 448, 452 (8th Cir. 2000); **Beckley v. Apfel**, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether claimant can return to his past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove his RFC and establish that he cannot return to his past relevant work. **Moore**, 572 F.3d at 523; <u>accord</u> **Dukes v. Barnhart**, 436 F.3d 923, 928 (8th Cir. 2006); **Vandenboom v. Barnhart**, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. **Banks v. Massanari**, 258 F.3d 820, 824 (8th Cir. 2001).  <u>See also</u> 20 C.F.R. § 404.1520(f). The Commissioner may meet his burden by eliciting testimony by a vocational expert, **Pearsall**, 274 F.3d at 1219, or "[i]f [a claimant's] impairments are exertional (affecting the ability to perform physical labor), the Commissioner may carry this burden by referring to the medical-vocational guidelines or 'grids,' which are fact-based generalizations about the availability of jobs for people of varying ages, educational backgrounds, and previous work experience, with differing degrees of exertional impairment," **Holley v. Massanari**, 253 F.3d 1088, 1093 (8th Cir. 2001).  "However, when a claimant is limited by a nonexertional impairment, such as pain or mental incapacity, the Commissioner may not rely on the Guidelines and must instead present testimony from a vocational expert to support a determination of no disability."  **Id.**; <u>accord</u> **Baker v. Barnhart**, 457 F.3d 882, 894-95 (8th Cir. 2006).  <u>See also</u> **Ellis v. Barnhart**, 392 F.3d 988, 996 (8th Cir. 2005) (noting that the Guidelines may be employed if the nonexertional impairment does not diminish or significantly limit the claimant's RFC); Social Security Ruling 83-47C, 1983 W.L. 31276, *3 (S.S.A. 1983) ("[I]f the nonexertional limitation restricts a claimant's performance of a full range of work at the appropriate [RFC] level, nonexertional limitations must be taken into account and a nonguideline determination made.").

If the claimant is prevented by his impairment from doing any other work, the ALJ will find the claimant to be disabled.

The ALJ's decision whether a person is disabled under the standards set forth above is conclusive upon this Court "'if it is supported by substantial evidence on the record as a whole.'" **Wiese v. Astrue**, 552 F.3d 728, 730 (8th Cir. 2009) (quoting <u>Finch v. Astrue</u>, 547 F.3d 933, 935 (8th Cir. 2008)); <u>accord</u> **Dunahoo v. Apfel**, 241 F.3d 1033, 1037 (8th Cir. 2001). "'Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion.'" **Wiese**, 552 F.3d at 730 (quoting <u>Eichelberger v. Barnhart</u>, 390 F.3d 584, 589 (8th Cir. 2004)). When reviewing the record to determine whether the Commissioner's decision is supported by substantial evidence, however, the Court must consider evidence that supports the decision and evidence that fairly detracts from that decision. **Id.**; **Finch**, 547 F.3d at 935; **Warburton v. Apfel**, 188 F.3d 1047, 1050 (8th Cir. 1999). The Court may not reverse that decision merely because substantial evidence would also support an opposite conclusion, **Dunahoo**, 241 F.3d at 1037, or it might have "come to a different conclusion," **Wiese**, 552 F.3d at 730. Thus, if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the agency's findings, the [Court] must affirm the agency's decision." **Wheeler v. Apfel**, 224 F.3d 891, 894-95 (8th Cir. 2000). <u>See also</u> **Owen v. Astrue**, 551 F.3d 792, 798 (8th Cir. 2008) (the ALJ's denial of benefits is not to be reversed "so long as the ALJ's decision falls within the available zone of choice") (internal quotations omitted).

Plaintiff argues that the ALJ (1) failed to assess his IQ scores and determine whether he meets Listing 12.05C; (2) erred in his analysis of Dr. Schlitt's opinion; and (3) erred when determining his RFC because (a) there is no supporting medical evidence and (b) there is no function-by-function discussion or assessment.

Listing 12.05C is for mental retardation and requires "[a] valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function."[12]  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C.  "The additional limitation need not be disabling, but it must have a 'more than slight or minimal effect on [a claimant's] ability to perform work.'" **McNamara v. Astrue**, 590 F.3d 607, 611 (8th Cir. 2010) (quoting Sird v. Chater, 105 F.3d 401, 403 (8th Cir. 1997)).

The ALJ stated in his decision that he had considered whether the criteria of Listing 12.05C were satisfied and concluded that the evidence did not establish the presence of such criteria.  (See Record at 21-22.)  This conclusory statement was his only reference to Listing 12.05C, nor did the ALJ at any time refer to any IQ scores of Plaintiff.  Those IQ scores

---

[12]Dr. Schlitt considered Plaintiff's IQ scores to be within the borderline intellectual functioning range.  Under Listing 12.05C, an IQ of 70 indicates mental retardation.  To satisfy Listing 12.05C, a formal diagnosis of mental retardation is not required.  **Christner v. Astrue**, 498 F.3d 790, 793 (8th Cir. 2007); **Maresh v. Barnhart**, 438 F.3d 897, 899 (8th Cir. 2006).  This is so because the "medical standard for mental retardation differs from the legal standard."  **Scott ex. rel. Scott**, 529 F.3d at 824 n.4.

include a verbal IQ[13] of 78 when he was repeating second grade for the first time and a full scale IQ of 70 when he was 32 years old.  This lower, later IQ was from testing during an evaluation performed by a non-treating psychologist.  "'[A]n ALJ may disregard a claimant's IQ score when it is derived from a one-time examination by a non-treating psychologist, particularly if the score is inconsistent with the claimant's daily activities and behavior.'" **Christner v. Astrue**, 498 F.3d 790, 794 (8th Cir. 2007) (quoting Muncy v. Apfel, 247 F.3d 728, 733 (8th Cir. 2001)); accord **Chunn v. Barnhart**, 397 F.3d 667, 672 (8th Cir. 2005)).  Plaintiff's score is not inconsistent, however.  He repeated second grade twice, dropped out of school in the ninth grade after a report card of Fs and Ds and a record of exhibiting negative behaviors, and did not live independently.  He testified that he was unable to read. In **Maresh v. Barnhart**, 438 F.3d 897, 900 (8th Cir. 2006), the Eighth Circuit Court of Appeals found that the claimant had exhibited deficits in adaptive functioning at a young age when he had frequent fights with other children, had dropped out of school after the ninth grade, and could not read or write.  The court concluded that "the ALJ should have found that [the claimant's] impairment manifested itself during his developmental period."  **Id.**  See also **Christner**, 498 F.3d at 794 (finding that low IQ score was not inconsistent with abilities of claimant who had dropped out of school at sixth or eighth grade, had attended special education classes, did not live independently, and was unable to read or write).  Plaintiff's

---

[13]"In cases where more than one IQ is customarily derived from the test administered, i.e., where verbal, performance, and full-scale IQs are provided . . ., the lowest of these is used in conjunction with listing 12.05."  20 C.F.R. Pt. 220, App. 1, § 12.00(D).

sporadic work record may also be indicative of a limited IQ.  <u>See</u> **Maresh**, 438 F.3d at 901 (rejecting Commissioner's argument that claimant's mental retardation did not preclude him from working as evidenced by his employment for one and one-half years).

Although silent as to Plaintiff's IQ scores, the ALJ did explain why he gave little weight to the non-treating psychologist's examination.  The explanation centers on the extent to which the psychologist's conclusions and diagnoses, including one for PTSD, depended on Plaintiff's reports, including those of flashbacks never before mentioned.  The ALJ did not explain why he did not credit, or even discuss, the IQ scores, nor does the explanation for why the ALJ discounted diagnoses of mental disorders suffice for an unexplained omission of any discussion of Plaintiff's intellectual functioning.

As noted above, Plaintiff's IQ was tested when he was eight years, eleven months old.  The lowest of these scores, see note 13, supra, is 78.  This places him in the borderline intellectual functioning range of intelligence.  <u>See</u> **Hutsell v. Massanari**, 259 F.3d 707, 709 n.3 (8th Cir. 2001).  The ALJ did not address the validity of this score; consequently, he did not resolve, or even discuss, which IQ score was appropriate.  Although "the regulations do not address which IQ score is the appropriate when multiple tests have been given," **Miles v. Barnhart**, 374 F.3d 694, 700 (8th Cir. 2004); accord **Muncy v. Apfel**, 247 F.3d 728, 734 (8th Cir. 2001), they do provide that IQ scores 40 and above that are obtained between ages seven and sixteen are current for only two years, **Scott ex. rel. Scott v. Astrue**, 529 F.3d 818, 824 (8th Cir. 2008).  Additionally, the validity of a WISC-R score may in and of itself be

questionable.  See **Oberts ex rel. Oberts v. Halter**, 134 F. Supp.2d 1074, 1086 (E.D. Mo. 2001) (noting testimony of psychological examiner that WISC-R was outdated and yielded inflated scores).

The ALJ's failure to address the question of Plaintiff's IQ included the omission of any reference to Plaintiff's limited intellectual functioning in the hypothetical question asked of the VE.  "[A] hypothetical need not 'frame the claimant's impairments in the specific diagnostic terms used in the medical reports, but instead should capture the concrete consequences of those impairments.'"  **England v. Astrue**, 490 F.3d 1017, 1023 (8th Cir. 2007) (quoting Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir.2006)).  Thus, if a hypothetical includes a reference to an eleventh grade education, a need for tasks that are learned by rote and require little judgment, and a need for simple, direct, and concrete supervision, the "concrete consequences" of borderline intellectual functioning are conveyed. **Id.** at 1023-24.  If, on the other hand, the hypothetical fails to reference established limited intellectual functioning at all, it is fatally defective.  See **Swope v. Barnhart**, 436 F.3d 1023, 1025 (8th Cir. 2006) (remanding case in which ALJ failed to include any reference to claimant's intellectual capacity (borderline intellectual functioning) when posing hypothetical question to VE).

The ALJ's failure to address the issue of Plaintiff's IQ, whether it places him in the mental retardation or borderline intellectual functioning range of intelligence, requires a remand.  See **Scott ex. rel. Scott**, 529 F.3d at 824 (remanding case in which ALJ cited IQ

scores but failed to discuss them); **Christner**, 498 F.3d at 794 (remanding for reconsideration when it was unclear whether ALJ expressly rejected claimant's IQ score); **Maresh**, 438 F.3d at 900 (finding that IQ score of 70 at age 37 in combination with special education classes, dropping out of school after ninth grade, and trouble with reading, writing, and math supported finding of mental retardation); **Chunn**, 397 F.3d at 672 (remanding for further consideration case in which it was not clear from record if ALJ considered whether claimant met requirements for Listing 12.05C); **Muncy**, 247 F.3d at 734-35 (remanding for further analysis of discrepancy between two IQ scores; ALJ had not addressed discrepancy or discussed what factors called into question the validity of the first, lower score); **Reeder v. Apfel**, 214 F.3d 984, 987 (8th Cir. 2000) (remanding for further analysis case in which ALJ did not list any reasons for discounting consultative examiner's IQ findings although record indicated that claimant had fourth-grade education level and had to stop driving because there were times she did not know where she was).

The ALJ's failure does not, however, require an award of benefits, as urged by Plaintiff. The validity of the 70 IQ score is not beyond question. An "IQ score[] must be valid, . . . the Commissioner need not rely exclusively on IQ scores, and . . . the Commissioner may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole." **Clay v. Barnhart**, 417 F.3d 922, 929 (8th Cir. 2005) (affirming ALJ's decision disregarding IQ scores within mental retardation range; examiner had noted that claimant had failed to put forth serious effort when

taking test and scores were inconsistent with other psychologists' observations of claimant). See also **Cox v. Astrue**, 495 F.3d 614, 618 (8th Cir. 2007) (finding support in the record for a finding that the claimant had borderline intellectual functioning rather than mental retardation; claimant was able to effectively communicate; had generally successful social relationships; exhibited self-sufficient behavior; and was not limited in her concentration, persistence, or pace); **Johnson v. Barnhart**, 390 F.3d 1067, 1071 (8th Cir. 2004) (affirming ALJ's decision disregarding IQ scores within mental retardation range when examiners found claimant malingered during testing and ALJ found no evidence of a lack of adaptive functioning by claimant); **Miles**, 374 F.3d at 699-700 (affirming ALJ's decision disregarding IQ scores within mental retardation range; claimant had attended regular classes in high school, had obtained Bs, had lived independently, and had never been terminated from a job due to lack of mental ability).

Because the merits of Plaintiff's second and third arguments depend on the validity of Plaintiff's IQ scores and his intellectual functioning level, a resolution of those arguments is deferred until the ALJ addresses the question of Plaintiff's IQ scores, including referring him for a consultative examination if necessary and including if appropriate his IQ or its concrete consequences in a hypothetical to a VE.

### Conclusion

Plaintiff might not be disabled within the meaning of the Act. The ALJ's finding that he was not is not supported by substantial evidence on the record as a whole for the reasons

set forth above.  Accordingly, the case should be remanded for a further clarification and explanation of Plaintiff's IQ scores and intellectual functioning level.  Therefore,

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner be REVERSED and that this case be REMANDED for further proceedings as set forth above.

The parties are advised that they have **fourteen days from this date** in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in waiver of the right to appeal questions of fact.

/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE

Dated this  22nd  day of June, 2010.